Here to you, here to you, this Honorable Appellate Court for the 2nd Judicial District is now back in session. The Honorable Susan F. Hutchinson, presiding. Your Honor, the second case on the docket this morning, Judge 1, Judge 0527, Ingrate, American Law, Levy, Petitioner Appellate, and Dropped Levy respond to the petition. Arguing for the attempt, Ryan J. Hurst. Arguing for the appellate, Mr. George S. Osborne. Well, good morning, Counsel. Nice to see you, and nice to be here in person for a change. Mr. Hurst, you may proceed when you are ready. Good morning, Your Honors, and may it please the Court, my name is Brian Hurst. Pull that mic up just a little. Thank you. Thank you. My name is Brian Hurst. I represent the appellate, Josh Levy. This case presents a truly tragic set of facts, but is here, and there are two bases on which the ruling of the circuit court denying Mr. Levy's 1401 petition should be overturned. Let me ask a question before you state those. Reading through the record and reading through the transcript, or I mean, rather your brief, I'm just not sure what you're appealing. Are you just appealing the 21401 that relates to the entry of the judgment, or are you trying to get us into some of the other issues that were raised, like removal and things of that nature? No, my appeal is restricted to my motion to vacate the judgment, my amended petition to vacate the judgment under 1401. It's my intention, unless this Court directs otherwise, only to address the issues as to why this default judgment should have been vacated. Okay. But your first issue, the question presented is whether a default judgment that awarded 100 percent of the marital estate to one party in support of nearly 27,000 is unconscionable. Yes, Your Honor. So that goes beyond whether or not the 21401 was issued. Well, the basis for relief, why we sought relief under 1401 to vacate the judgment was the unconscionability of the judgment. I get it. Okay. The trial court found that you had not proven your case correct with regard to setting aside or vacating the judgment. Correct. You hadn't proven that there was any type of overbearing fraud, et cetera, correct? It was basically your client's delusions that you relied upon. There was two bases, Your Honor, and that's what I intended to say. Well, the unconscionability was one. Unconscionability is one because we have a judgment. And the trial court found that when he awarded 100 percent of the marital estate to Molly, that actually he was awarding 100 percent of nothing because the defendant or the husband, Josh, had spent all the money. You have recited the courts holding correctly. Now, the issue that then Judge DeRue found that she was essentially awarded 100 percent of nothing, and that has been argued by Molly in her brief. But that's really misnomer. Because of the same date that that order was entered, denying the 1401 petition, judgment was entered against Mr. Levy for $102,000 from the college account. In addition to that, this judgment that awarded her 100 percent of all known and unknown assets, accounts, and the like that were in existence as of the date of the judgment. Okay. Let's ask that question. What proof was there by Josh of what was in existence on the date of the judgment? Oh, there is – that is not a contested fact. The fact is that there is an admission by Molly as of the date of the judgment. There was a 529 plan which had a balance of approximately $102,000, which subsequent to the entry of the judgment was dissolved and those monies expended. And it is the judgment that is for replacing those monies that was awarded to Molly. In addition to that – But were they awarded to Molly? Those were the funds of the children, correct? Well, no, because they were – the children were the beneficiaries of the 529 account. The account was titled in Josh's name. And because it was titled in Josh's name, under the terms of the judgment, all accounts under which Josh had signatory authority for were awarded to Molly. Therefore, it was Molly's property under the terms of the judgment. It is a – She would be holding them for the children. No. She has absolutely – the holder of a 529 account has every right to dispose of those as they see fit. Right. Let me ask you this question. But any good conscience belongs to the children. What people do with monies that are set aside in custodial accounts is their decision. But the title holder, the property interest would have been – was awarded to Molly. And the judgment that Molly received doesn't say that Molly is rewarded $102,000 for the benefit of the children. Molly is awarded $102,000. And I know you had a question, Your Honor. But in addition to that, before I – if I may, there was – Molly acknowledges – it is not contested. There were other – Molly acknowledges, and it is not contested, that at the time of the entry of the judgment, Josh had another account, a business account, that she claims had a balance of $500,000. That money, under the terms of this judgment, this default judgment, is also awarded to her. Now, they have said to the Court, well, she has taken no action to collect on that and doesn't intend to. And that's a business – the Court said also that that is a business account. It's an LLC, correct? It was a business account, Your Honor, but under the terms of the last provision of the judgment, I believe it was paragraph O in the award portion, all accounts, it doesn't – it was – he has signatory authority on. He was an owner of this. But Josh testified that he spent all that money. He used it to pay – to operate the company, to pay earnest money, to pay legal fees, engineering and architectural fees, et cetera, correct? The monies have subsequently been expended. It's all – it's all been spent. That is correct. And there was no – the trial court did not order him to pay back the money that was in the account at the time of the judgment? The trial court found that that issue was not presented to it. It was not before the – properly before the Court. There had been some argument and discussion during the hearing as to whether she was going to waive that interest. She refused to do so. The claim remains – it remains a potential claim. But under the clear terms of the judgment, she is entitled to those funds. How does any of that, with – especially with respect to what the trial court knew at the time, show that the order was unconscionable? Well – He was making – he made, what, $850,000 in 2017? Which was the year prior to the divorce proceeding. The court also looked at his income from – from 2015 through 2017, correct? I believe – I believe that's correct. And he earned in the range of $100,000 in each of those two prior years. Now, the judgment itself is unconscionable because unconscionability is defined by our courts. The case that I – the seminal case of In re the Marriage of Richardson is an arrangement that is so onerous and one-sided and oppressive that no one, not suffering from a delusion – and that is the language from Richardson – would enter into such an agreement. And – Well, Richardson – Richardson, you have to acknowledge the facts are much different, especially with the disparity in wealth that occurred as a result of the judgment. Of course, Your Honor. And the wife only got 7.5 percent of an estate that was worth tens of millions of dollars. That's markedly different than this case. And her – the suffering that she was undergoing was much different than the delusions your client had. No question, Your Honor. And I – I don't bring Richardson to you to say that this case is like that case. You bring it to us for the definition of unconscionability. That is correct. Okay. But if – and you correctly mentioned, Richardson, she got 7.5 percent of an estate which was still millions of dollars. And this estate was significantly less. Molly got 100 percent. It is mathematically impossible to have any kind of settlement in a divorce case that is more one-sided than this. This isn't a settlement. I know you've said that multiple times. But as the trial court found, when he entered that order, she essentially got 100 percent of nothing because there was nothing in the account. The judgment was in there. And whose burden was it to prove unconscionability? It's your client's. It's our burden. Right. No question about it. Just saying because she got 100 percent, does that establish unconscionability? Yes. It does. Absolutely. Do you have a case that says that? No. There is no case that says that. Right. And there is no case that says that you can rely on a delusion to create a meritorious defense or to excuse the lack of due diligence, correct? No. I have no cases on point to that. However, he knew about the judgment. He was provided notice. Actually, he lived in the marital household at the time, and he did nothing for 16 months. That is correct. Okay. Now, the test that this Court should apply to those factors, because you're correct, I don't have a case that says if you can establish I'm delusional that I should be entitled to relief. The test comes from our Supreme Court in the – from the Warren County case. The question before this Court is if these facts were known to the trial judge at the time that the judgment was entered, would that judge still have entered the judgment? Would it have precluded entry of judgment? And I've been doing this for 20 years. I refuse to believe that any judge at a prove-up who said, here is a prove-up, and said, by the way, the defendant is not appearing in court because he is under the belief that the internationally famous rock band Phish is going to retain counsel for him. He believes he's internationally famous. He believes that he has a television show, that any prove-up judge would say, that sounds reasonable, and enter this judgment. A prove-up judge would say, has anybody advised him to get counsel? And as Molly said, I told him he should get a lawyer. But did she – did Molly ever reveal to the Court, as I think you say in the briefs, that he was suffering from delusions? Never. Now, we have had an argument as to whether there's a – Molly had an affirmative obligation to do so, but again, that misses the point, to my mind. The point is, have these things been known? Because they were certainly known to Molly. And we know this because 11 days after she filed her petition for dissolution of marriage, while they were living together, they entered into this agreement in anticipation of divorce, which Molly negotiated certain financial benefits for herself, and Josh was under an obligation to prove three things. One, clearly and undeniably that he is – the actress Elizabeth Hurley is his girlfriend, whom he had never met. Two, that he will appear on the cover of at least four nationally distributed And three, that he will establish that he is, quote, famous and well-known in Hollywood. To establish this, he must secure two separate letters, either on company or on personal letterhead, from any of the following. The editor of Rolling Stone Magazine, the editor of Vogue Magazine, the executive producer of the Today Show, the editor of Glamour Magazine, the president or CEO of Paradigm Town Agency, ICM Partners, or CAA, Sir Elton John or Madonna. The letters must include the phrase, quote, Mr. Levy, we consider you We've read the record. You probably want to focus on answering our questions. Of course, Your Honor. Josh complied with the terms of the judgment for several months, almost a year, correct? Not fully, but he was paying $15,000 a month. He did make payments to Molly.  According to his testimony, he stopped paying, not because of the removal of the children to Arizona, but because he ran out of money. He could no longer afford the payments, correct? That's what's shown in the record. And the trial court said, look, your remedy, you should move for modification of maintenance and child support because of the substantial change in circumstances, correct? That's the real remedy, isn't it? That is a remedy. But the basis of our claim for unconscionability is not the amount of support alone. It is the fact that she was awarded 100 percent of the estate, that she now has a judgment against him for $102,000, that she has a very viable claim based on facts that are in the record that are not contested, that she has a basis for another $500,000 in judgment. Now, counsel, that one, you quoted that he is a signatory or they are a signatory to. The judgment says Molly is awarded 100 percent of parties' retirement and nonretirement accounts and investments which held jointly or in the name of either party pursuant to 5503. That $500,000 or whatever, $462,000, whatever the actual amount was, that wasn't held by him personally. They asked you. It was held by Levi Archer. May I ask you which paragraph from the judgment you're referring to? E. Under the --" it is awarded to the order. I would ask you, if you go further down, in paragraph O, there is another catch-all, and I believe it's paragraph O, that would capture --" If any additional assets are located belonging to the parties which existed as of the date of the dissolution, they are awarded to Molly. But once again, you have to take O in consideration of what I just read, E, that he has to own. He does not own that $500,000 account. It's owned by Levi Archer or whatever they were calling themselves at the time. And he was an owner of Levi Archer. They had those partners had a right to those funds. And under the terms of that paragraph, it is --" He didn't get it. She did not get that. Now, she may not want to give it up, but she didn't get that, according to this document. Under the terms of this --" Under the terms of that judgment, that property should have been awarded to her. His interest in Levi Archer should have been awarded to her under those terms. Well, that's another argument, but I don't think we can use it. Josh's own testimony was that all of the money was used for business expenses, which is what it's reportedly intended for. If I recall, Josh testified to a variety of things. I don't recall all of them. Well, he testified that he used it to operate the company, and then he gave examples, paying the earnest money, legal fees, engineering, architects. So, essentially, he continued to spend the money and continued to work after the judgment, correct? The record does not indicate what type of work or how much work he was doing. We do know that the money was expended after the judgment, but I respectfully submit that the paragraph that we just discussed awarded any asset, and this interest was an asset, and wouldn't have been awarded to Molly, which informs the unconscionable judgment. I thank you for your time. I have one question. Of course. What was the holdup in filing the 214-09 petition? And what's the good faith basis for waiting? Josh has at all times, and is supported by the record, has been operating under these delusions, which we've discussed from the time that he and Molly entered into this agreement to the time that this matter went to trial. We've never suggested to the Court that Josh was unable to make decisions or take actions, but at all times, and Molly does not contest this, his delusions and his psychosis informed all of his decision-making, and that's what interfered. Well, he only hired an attorney, finally, at the prompting by his father, right? His father and his uncle. But he had the judgment. He knew exactly what he was supposed to do. He was paying $15,000 a month until he was convinced he should hire a lawyer. No, no. Actually, you were hired by his father, right? I was hired by the uncle, and I'm not so sure that those things are record, so I don't want to go beyond the record, but it was not until I was hired that the 1401 petition became, when I reviewed this judgment. Thank you. Thank you. Mr. Ostrow. May it please the Court. I'm Joel Ostrow here on behalf of Molly Levy. Many of the facts that I was going to emphasize here have been covered by the Court. I would like to say that I agree with Justice Hutchinson that you have to read E&O together, but even if they were in conflict, which I don't think they are, a specific provision of a contract always controls over a general provision, and the specific provision is in E that it had to be in the party's names to be awarded. Well, let's get right down to the nuts and bolts of this thing. The question is, how is this not unconscionable when you have, you have a default 100 percent in favor of the wife? Because she got 100 percent of nothing. I understand, but as counsel says, that's 100 percent of a judgment. She might not have anything now, but isn't that judgment going to follow this guy around? Well, I think that we have to deal with the reality of the situation, which is he took all the money. He took the $102,000, and not only did he spend the money, the other $500,000, which is not even an asset divided in the judgment, to wind down the businesses, but in his testimony about how he financed his way around Europe and the United States, he said that he got the 529 money by calling a broker six or seven times and getting checks, that he wrote checks out of his checking account, never saying where that money came from, and ran up $150,000 in credit debt without ever saying that he had to bankrupt his way out of that. So somebody was extending him that credit based on something, and she has been deprived of everything. Did she not know of his mental state at the time of the divorce? Of his what? Mental state? Mental state. Well, that's interesting, because when Josh filed his leave to amend his 214-01 petition, and that leave to amend was more than two years after the judgment was presented, to say that I was incapacitated, he said that the reason he did not file it until then was because he didn't know that Molly knew of any of this until she testified to that at the relocation trial. And as Mr. Hurst just said now, that's just not true. Right. He read that document. Right. But being under delusions doesn't mean that you are incapacitated to call a lawyer. Oh, I understand that. But my question to you was, if she knew of his mental state at the time, why did she not mention it to her attorney or to the court? Well, she may have mentioned it to her attorney. She didn't tell the court. I told them to get a lawyer. Right. But she – there's no case, though, that would say she had a duty to do that. She's not – I understand that, but we're looking at unconscionability. Right. And so the issue with respect to unconscionability, if the court had that information or that knowledge, perhaps they would not have given 100 percent of nothing to know. I don't think the court would have done anything differently. The court knew that Mr. Levy had been served with the petition, knew that he got a – before he was even served with the petition, he got a letter from her attorney. The court knew that he was served with the motion to enter a default, was sent the prove-up order, or the default order that set the prove-up for a date certain. He was given the judgment. He was served a warrant to enforce the judgment by the sheriff when he didn't move out of the house. And he did nothing. And he knew he needed a lawyer, not only because Mrs. Levy told him, but because – let's assume that it's true. We never produced the document, but let's assume that it's true, that he sent an email to one of the members of the band Phish to get him a lawyer. Well, that shows he knew he needed one. And when he got no response, he still needed one. And all this time, he was winding down his businesses, dealing with lawyers and accountants. During all the time that he traveled, and I think it was Justice Hutchinson that mentioned, you know, what about the intervening 16 or 17 months? I think it was Judge Shostak. And that's part of proving that I acted with due diligence, is proving I was always under something that incapacitated me from doing what I needed to do to protect myself in this case while I did everything else. Counsel argues that the lawyers that he hired, the business lawyers, that was actually – he had a partner that was doing that. It wasn't just him. Sure, he had a partner. It wasn't just him, but he participated. He got a $62,000 broker commission in 2018. And he testified that they were trying to close the Chick-fil-A deal during the period of time when he was paying the $15,000 a month. There are several cases that say if you want to establish that your mental incapacity prevented you from protecting your own legal rights, that you need to produce an expert. Just because Molly knew that he thought Elizabeth Hurley was his girlfriend and he had a TV show and whatever else was being bandied about at the time doesn't mean that she knows that he doesn't have the ability to call a lawyer or call his father, who was a lawyer. And I don't think we can assume, because I don't think it's even correct, that if Mr. Warren, who was Molly's lawyer, proved up and said, well, Judge, you know, Mr. Levy believes this, that, and the other thing, that the judge would have said, well, geez, I guess you can't get divorced now. Come back here when he's better. Mr. Warren and Mrs. Levy are not diagnosticians. All they can say is, you know, here's things that he has said. But then they would have, and if the judge said, well, doesn't that render him incapable of being here, the judge also would have then been informed, well, he's running three businesses. He's dealing with lawyers and accountants in those businesses. And even, by the way, in the answer to the 214-01 petition, Mrs. Levy stated that at Mr. Levy's deposition, he stated he chose not to participate in the divorce case. And again, I think the most compelling thing here is, it's simply self-indulgent and self-gratifying to say, I can make every other decision in my life, and I can conduct my life in every other way. I mean, that's a lot of travel he did. And he said, I did it all. I made the reservations. I paid for it. I have my passport. But this is the one thing I couldn't do, and you should find that I was too mentally ill to do it. He finally did sit for a deposition, correct? Right. And at that deposition, he relied upon the physician-patient privilege that he was not going to answer questions regarding his mental health or any diagnosis. That's correct. And he also said, I think during the relocation proceeding, that my mental health is not an issue here. He also said sometime during the proceedings that those statements about the delusions he had were fabricated. So essentially, you know, in the 2-1401 proceeding, you have to say you have a meritorious claim, which he doesn't because he's got all the money, you know. And the children's money should be reimbursed. And there were no other assets. There are no other assets. There was furniture. But do we even know the value of that furniture? No. And they lived in a rented house, so I doubt. Which Molly had to move out of. Correct. She couldn't afford it. And then to clarify sort of the timeline here is I believe that Mr. Levy engaged an attorney when the relocation petition was served upon him. And if you want to say I acted with due diligence, you have to establish during the entire period of time, the time where he could have filed the 2-1203 petition, the time when he could have filed the 2-1401 petition, the time when he could have filed a petition for modification. I was too incapacitated to do all of that or any of that. And he didn't he didn't show a case to say you have to show. He didn't produce the type of evidence that you have to produce. And now he's saying, well, gee, I spent all the money, but I shouldn't owe her anything. I shouldn't reimburse the kids accounts. So he has. It's not unconscionable. If anything's unconscionable, it's what he did to his family. That's unconscionable. He could still file a motion. If we find that there was, you know, he didn't have an error toward his defense and he didn't act with due diligence. He could still file a motion to modify. Sure. Sure. And he may have. But a lot of time ran by and he accumulated in a rearage. And he accumulated in a rearage accumulated because he didn't protect his own rights. And she and she has not sought to enforce that. And that's all speculation as to whether it becomes an onerous thing to him. It depends on him actually being able to pay the money, her going after the money and then him not disappearing somewhere without paying. And it's just the fact that she has a claim does not render the judgment unconscionable. And Mr. Hearst, you know, did not argue about the maintenance itself. And I do want to want to point out that. And I think Justice Piquette touched on this. But I want to add one fact to it. He did make over $800,000 the year before the judgment was entered. And both he and his partner had told Molly that Chick-fil-A deal, which did not collapse until August of 2019, was going to likely to produce them two million dollars, which they would divide. So the amount that was set was not unconscionable. And I did a little calculation in my brief that even if the judge had decided an income average of three years, which was under no obligation to do, he still would have owed her what he paid her. Basically, he would have you know, he would have what he paid over those six or seven months was 10,000 in maintenance and 5,000 in child support. And under an income average, that's what he would have owed her. So the maintenance that was set was within the court's discretion at the time of the prove-up. And he never came in to modify it to say my Chick-fil-A deal collapsed. I'm not making any money. I can't pay this anymore. And the consequences of that fall on him and not on my client. Well, Mr. Ostrow, I'm going to ask you the same question I asked Mr. Hurst. And that is, although this presents itself as a 214-01 petition, there has been a lot of discussion, both in the brief and here, that there was a judgment entered that same day for that $102,000 in the 529. Is that order here subject to consideration? Are we only considering the 214-01? I think you're only considering the 214-01 because the $102,000 is simply an enforcement of the judgment. It's not a modification or anything like that. So if there's no further questions, thank you for your attention. All right. Thank you. Thank you. Mr. Hurst. If I could just follow up on the last point that Mr. Ostrow made. The $102,000 is part of the judgment. So when the trial court enters an order saying to you and to the parties, she really got 100 percent of nothing. It's simply not factually correct. It's a judgment. But if you don't show that you had a meritorious, he had a meritorious defense and, you know, why he didn't exercise due diligence in filing this 214-01, then we can't go forward with anything, can we? Well, the 214-01 was filed within the two years that it was allowable under the statute. It invokes the court's equitable powers. And that is the entire basis for this relief. The court is the divorce court is obligated under the purpose section of 102 of the Illinois Marriage and Dissolution of Marriage Act to ensure that provisions, adequate provisions are made for the entire family. And that includes Mr. Levy. Ms. Levy had an obligation to support him. You asked Mr. Ostrow about the notice to the court and whether or not she, Molly, shared this information about Josh's mental health with her attorney. The record is silent as to that, but that's a significant question. It's a significant question because if that information was known to the attorney, the attorney had obligations under the rules of professional conduct, duties of candor to the court, duties of fairness to an opposing party. Now, again, the Warren County case, in the context of 1401, gives a very detailed discussion about the role of equity in 1401 relief. And given Mr. Levy's mental condition, which Molly doesn't contest, she says she's not a diagnostician. She was living with this man. She enters into this contract. She described at one point his dancing so hard he wore out the carpet. Okay? Mr. Ostrow makes a good point that your client apparently, from this record, is operating in all other facets of life normally with the exception of understanding or the need for him to retain counsel in this divorce proceeding. Right? I mean, he's a businessman. He's traveling. He's making decisions, hiring architects. Engineers. Respectfully, Your Honor, if you look at the text. But that's the record. I don't believe that is accurate, an accurate summation of the record. If you look at the text. Isn't that what Josh's testimony was? I don't recall what the timeframe about these alleged decisions were. I certainly acknowledge. I'm talking about his testimony, record page 250, where he's testifying how he's spending money, what he's doing, where he's going. And as I stand here now, Your Honor, I don't recall the timeframe for that. I do not contest that he was traveling. After the divorce, he was traveling. Conducting business. I'm happy to verify. Conducting business. I don't do not believe that. He was still working on the Chick-fil-A deal at the time of the judgment. And if the Chick-fil-A deal fell through, and if you look at the business returns, which are exhibits that were part of the record, the 18 and 19 tax returns, this was hardly a flourishing business. What about Mr. Ostro's point about the failure to call an expert witness to testify regarding his noncapacity? The point of the 1401 petition was not based exclusively on his noncapacity. If I had brought that petition. That's a big part of it, isn't it? Certainly mental health is a part of it. You have to show due diligence in presenting the defense. Correct. And the trial court did not rule against me based on a finding of a lack of diligence. That is not. We can confirm on any basis reported by the record, though, correct? The trial, all that's contained in the record is the trial court's finding that she received 100 percent of nothing, which I have addressed. But again, under Warren, the question before this Court is, were these facts known to the trial court at the time of entry of the judgment? Would it have precluded the entry of the judgment? And you ask Mr. Ostro about that, and he says to you, maybe the court would have done this, maybe the court would have done that. We don't know what the court would have done, but I have to believe that any reasonable jurist presented with this information that was in the possession of Molly at all times prior to the entry of the judgment would have given pause for her entry of the judgment. If that information had been presented to the court, Mr. Warren would have countered and said, Judge, he's operating in all other spheres of life normally. He's running a business. He's spending money. He's traveling. He's, in terms of his executive functioning, he's at a high level. Then there could have been some reasonable determination made, and it's information that should have been available to the court. But I don't believe that that proceeding would have happened on the date that the judgment was entered. I believe that there would have been some subsequent proceeding which would have provided some assurance that the court was adhering to its mandate under 102. On behalf of my client and myself, I thank you all for your time and your interest in the subject. One other question, though. There is nothing that will preclude the defendant to proceed on a motion to modify this, correct? That is absolutely correct. Thank you. All right. Thank you, counsel. We appreciate your argument here. Again, an interesting case to consider. And we will take the matter under advisement and issue a decision in due course. At this point, we stand adjourned.